know who each of you are and who you represent. I'm Nicole Jones, the Office of the State Appellate Defender. I represent the appellant in this matter, Ms. Annette Harris. Okay, Ms. Jones. Good morning. Assistant State's Attorney, Sarah Simpson, on behalf of the people of the state of Illinois. Okay, Sarah Simpson. You guys have been here many times, so the typical rule is 15 minutes per side. Save some time for rebuttal. And if we wind up beating you up too much with questions, we'll be more lenient on the time. Okay? Please proceed. Good morning, Your Honors. May it please the Court. Again, my name is Nicole Jones, and I represent the appellant in this matter, Ms. Annette Harris. I'd like to reserve a few minutes for rebuttal. Today I'll be addressing the first issue raised in the briefs, the presumptive inadmissibility of all of Ms. Harris' statements under Section 103-2.1. If I have a few minutes at the end, I'd like to address her unequivocal request for counsel on May 1st. We want to get to both of them, so we'll make sure you have time. Okay, thank you. Speaking to the first issue, Ms. Harris made statements on April 20th and 21st subject to a custodial interrogation that were unrecorded. Under Section 103-2.1, those statements were presumptively inadmissible. The state had the burden via preponderance to show that one of the exceptions to 103-2.1 applied. The state did not do so. Thus, all of Ms. Harris' statements should have been suppressed. As an initial matter, the defense counsel below showed that this was a custodial interrogation. Ms. Harris was in custody. The court below found that she was in custody. The state concedes that she was in custody but argues that she was not in custody on the murder but rather that she was in custody on a violation of probation warrant. Does that make any difference in your view? No, that doesn't make any difference. The statute doesn't curtail the definition of custody in that way, nor would that be consistent with jurisprudence defining custody, which says that the reason why a person is in custody is irrelevant to whether they are in custody. Furthermore, the trial court stated that arguably she was in custody on the murder after she was noted with deception on the polygraph exam. And I'm going to quote from what the trial court said. There's at least an argument that she was in custody after her colloquy with the polygraph examiner. She's in custody on this case from then on. She's not leaving. If that probation warrant would disappear, I don't know if she's walking out the door. At that point, she's a suspect in the murder. But in addition to that, all of the objective circumstances show that she was in custody. The location was police-dominated. She was at Area 2 and at the polygraph exam offices and Pershing Road. The timing was early in the morning and late at night. That's when she was asked questions. The duration of the interrogation was over 24 hours. The mood was confrontational. She was confronted about inconsistencies. Did the police know at that point in time, we're talking early on, before the polygraph or any of that, did the police know at that time that the defendant had a violent history with the victim? Yes. They knew that there was an existing report showing, according to one police report, a similar incident to the incident that caused Mr. Williams' death. And later on, before the polygraph, they find out that there was another violent incident or alleged violent incident between her and another friend of hers, Mr. Sam Coffey. So there is at least an indication that she has this violent history that they know about. The mode of the interrogation also supports a finding of custody. She was not told she was free to leave. She was not told that she did not have to answer questions. She was picked up at a time and a date of the police officer's choosing. And then she does have indicia of a formal arrest. She is given a form to sign before the polygraph exam that contained Miranda warnings. She was also, one of the first things that they talked about, she and the police officers, was that she had this other arrest warrant out for her. So a reasonable person, innocent of any crime, after talking to the police about an outstanding arrest warrant and having all these other factors, would not feel free to leave. If we assume for the sake of our discussion here this morning that the custody aspect is satisfied, what about voluntariness? Because the state makes an argument at page 27 of its brief, saying that the court specifically found that there was voluntariness here, which would, you know, arguably say that the exception was met and that there's no need to throw the statements out because they were not videotaped. What's your position on what the court specifically, what was put before the court on the issue of voluntariness? What ruling did the court specifically make on that limited issue? Well, the state concedes that they put no evidence forward specifically speaking on voluntariness. But secondly, the court didn't find that this was voluntary. And the standard here is voluntariness and reliability. And the court didn't even mention the word reliability. So what the court said here is that, and this is a quote, the remedy you're asking for is not because there's a question of voluntariness, it's a question of do they have different rooms, polygraph guys over here, detective's rooms over there, there are different facilities. To go to that extreme remedy, for what I find to be whatever happening, not acting out of voluntariness, I think that's an extreme remedy outside the boundaries of this court. So he didn't really find that this was a voluntary statement. And the state put forward no evidence that this was a voluntary statement. We don't know if she was coerced. We don't know if she was threatened. We don't know if she was promised anything. We don't know her physical, mental, or emotional condition. We know that she did use crack cocaine with some frequency. We have no idea if she was under the influence of drugs or alcohol at the time. We don't know if she was fed, if she went to the bathroom, if she was given an opportunity to have food. Really, none of the indicators of voluntariness were displayed here. And then, again, as I said, the state did not present any evidence of reliability either. And although there's not a reliability test that's in the statute, if we look at other reliability tests under 115-10. Can we look at the record and say, you know, we think that it seems reliable and that it was voluntarily given? Is that proper for us to do? I don't think that you have enough evidence on this record to say that the state met its burden to show voluntariness and reliability. And I think, specifically, looking at her statement, at least the contents of her statement, there's no way that that's reliable because she gives two inculpatory statements that are diametrically opposed. One of them has to be false. Under one statement, she says she was a lookout while two other individuals robbed Mr. Williams and one of them went, quote, off script and hit him with an iron. Under another statement, she says, I asked Mr. Williams for money. He became sexually aggressive. I said no. He threatened me with a knife and I grabbed the closest thing, which was an iron, and hit him. So both of those statements can't be true. They can't both be reliable. I also think that this statute, because its purpose is to prevent false and coerced confessions, but it's also to protect police officers from allegations of abuse and coercion, it should be strictly construed. If you look at the legislative history, they said that when someone's in this position and they're not considered a suspect, they're asked these questions, that we should still see if the state can apply any of the exceptions. And the state didn't do so here. So all of these statements should be suppressed. I want to back up just a moment now to speak to the issue of the Miranda. You made reference to the fact that the polygraph examiner gave a consent form to the defendant that contained Miranda rights. Is there anything in the record which would indicate that those rights were specifically read to the defendant or that she read them and acknowledged them? Is there any finding anywhere in the record by the trial court that there were a waiver of those rights and that that waiver was knowing and intelligent? No. We don't know if those were read to her. We don't know if she can read. We don't know if she understood them, and we don't know if she waived them. Certainly not before that polygraph. But she did sign a form waiving them. Is there anything in the record more detailed than in the briefs about her asking for an attorney? No. There's no additional information other than the videotape where she asked for the attorney. So it was later? It's later that she asked for an attorney, but we don't know if in the unrecorded portion she asked for an attorney or she said, I don't want to talk to you. None of that came out during the motion to suppress. Let's take Justice Smith's suggestion and move on now past the statutory objection that you have and talk about the statements that were given after she indicated that she wanted to talk to a lawyer and then the police officer left the room briefly, came back a minute later, and there was this business about I left my phone numbers over at county or something. Let's talk about those and her invocation of the right to counsel. On May 1st, Ms. Harris asked for a few days to get an attorney. And there were two permissible responses to that. Okay, we'll halt questioning while we get an attorney for you from the public defender's office. Or if for some reason the officer believed this to be an equivocal request for counsel, proper police procedure should be to question her about whether or not she was asking for counsel. The officer did neither of these things here. He said a few days, no. And then she proceeded to ask how long can I, and presumably how long can I have to get counsel? And the officer left the room, came back about a minute later with another officer, and asked her a question, you know, if you want an attorney, we're done talking right now. And she indicates something. The videotape is very poor. I'm sure you guys have seen it. We can't tell whether she indicates yes or no. But then the officer said. It did seem that she said something to the effect that all my numbers are over-counting. And that, we're arguing, is an indication, I think it's a pretty clear indication, that she's trying to figure out the means by which she's supposed to contact counsel. And unlike the cases that are cited by the state, Evans and Quvedo, where the state, where the officer said, we'll put this on hold and we'll contact the PD's office for you, Ms. Harris was never alerted to how she would get counsel. When she asked for counsel, and she was trying to figure out how to get her phone numbers from county, they never said, okay, we'll put this on hold and we'll give you an opportunity to talk to counsel of your choice, or we'll contact the PD's office. Instead, they just said, and it's a little bit foggy, but it's something along the lines of, do you no longer want to answer questions? And she says, yes, I want to answer questions. But she doesn't say, I want to answer questions without an attorney. It's clear that she wants an attorney there to advise her before she answers these questions. So for these reasons, all of her statements after her invocation on May 1st, should have been suppressed on that ground. Are there any further questions? Or if there are no further questions, then on the basis of these arguments and those in the briefs, we ask that you reverse your conviction outright on the basis of issue number 3, or suppress your statements and reverse and remand for a new trial on the basis of issues 1 and 2. Thank you very much. Thank you, counsel. May it please the Court, Assistant State's Attorney Sarah Simpson on behalf of the people. Your Honors, the one thing that was never contested by the defendant at the pretrial proceedings in this case is that the totality of her statements were voluntarily given. Because they were voluntarily given and because the record establishes that they were in fact reliable, they were all properly admitted under subsection F of the statute. Now specifically, the defense agreed that these statements were voluntarily given at three specific instances in the record. At the beginning of the pretrial motions, the defense stated that it was not raising an allegation of coercion. Now this is significant for several reasons, but one, if there was any allegation of coercion to raise, first of all, defense counsel certainly would have raised it in a pretrial motion and he did not and neither did he raise it at the trial level and also at the appellate level. Counsel here has not raised any issue of ineffective assistance of counsel for failing to bring a motion based on coercion, which leads us to the conclusion that there must not have been any reason to bring such a motion. Secondly, the defense counsel also not only raised that there was no allegation of coercion at the beginning of the proceedings, at the end of the motion. Are you conceding that it's a custodial interview? Absolutely not, Your Honor. In fact, our position is exactly opposite. But in purposes of your argument now, you're just going forward to the voluntary process. Well, what we've submitted to this Court is that this Court, if it so chooses, does not even have to reach the issue of whether it's a custodial interrogation or not because these statements were voluntarily given in their entirety and reliably made. And therefore, if this Court so chooses But isn't that a determination that must be made by the trial court? And Justice Lavin made reference at some point into your brief in the 20s. I also note on page 16 in the very first paragraph of your argument, you say, the trial court specifically found the defendant's statements in their entirety were voluntarily given. Is that in the record? It is, Your Honor. To look at the Court's entire ruling, counsel quoted part of it. But when the Court was ruling on this specific motion, he wrote, the whole purpose of this body of law and videotaping statements is because some legislatures raised concerns about whether statements were actually voluntary or not. You want to put that to rest. It's all about voluntariness. It's completely about voluntariness. The remedy you're asking for is not because there's a question about some voluntariness. It's a question that they have different rooms. Polygraph guy's over here. Detective's room is over there. There are different facilities. To go to that extreme remedy for what I find to be whatever happening, not acting out of voluntariness, I think that's an extreme remedy outside the boundaries of this Court. We've looked at that, and quite frankly, I don't think that it says what you want it to say. I don't think that the judge was specifically making a finding. And if we were able to go back in the record and find all of the indicia of voluntariness that had been brought up by the State in the hearing, maybe we could anchor it more to what the judge is saying. But it doesn't seem like there's a nexus there. Well, two responses to Your Honor's concern. The first is that the Court, clearly from its ruling, found that these statements should not be suppressed. So in that ruling, it's either because she was not subject to a custodial interrogation at the time she gave these statements, or because they were voluntary and reliable. That's the way, you know, reading the record, it does seem like Judge Lynn was making a finding that it was noncustodial. He specifically was talking about the fact that she's there on probation, but, you know, just a witness on the murder. So it seems like that you could read this record and come to a conclusion that he was making his decision on the videotape statute solely on the basis of whether or not this was a custodial interview, and he found that it was not. We didn't see the same level of proof by the State or the same level of directness in the ruling by the trial court on the issue of voluntariness. That's the problem that we're having. Well, we would submit to the court that the reason that that information is not in the record is because the defense agreed to it. They essentially alleviated the burden of proof of the State because they specifically said they weren't contesting voluntariness. They said that at the motion when the court was ruling, and they said it in their post-trial motions at the end of this. When they raised this issue in their post-trial motion, they specifically stated that the defendant's statements were not involuntary based on the totality of the circumstances. They chose, in fact, to attack the reliability of the statements. So because the defense essentially agreed that there was no voluntariness issue, it alleviated the State of having to prove that. But it becomes an issue if there's a determination that this was a custodial interrogation that should have been videotaped, right? Then it becomes an issue because now the statement is presumed to be inadmissible, and you have to establish an exception for its admissibility, right? Under the statute, that's correct, Your Honor. However, our position is that the defense has already agreed that they're voluntary. So therefore, that issue is waived or forfeited. I mean, it's almost like a stipulation. They've agreed. Well, it's different, isn't it? To not advance the issue is not to stipulate to the validity of the voluntariness. Understandable. It's just not right yet. Understandable. But they did more than just not raise the issue. This is not a case where they made no pretrial motions whatsoever. They made an affirmative decision to challenge these statements only on the basis of this videotaping statute. And had they prevailed and the judge said this was a custodial interrogation and it should have been videotaped, then the next step is to test the voluntariness. And to do that, isn't it the state's burden then to go forward and establish a prima facie case and then the burden shifts to the defense and the defense has to establish involuntariness? That's the process, right? That would be how the statute is written. In this particular case where the defense came forward several times saying we have no issues to voluntariness and they were saying that the only issue is to the reliability, they're almost asking the state to prove a negative. They're saying we agree, there's no issue here as to voluntariness. These are voluntary statements. And then they alleviate the state's need to prove they're voluntary because the defense is agreeing. And so we would say that the trial court did find that these were voluntarily given and that is supported by the manifest way of the evidence. That's supported. However, if this court finds that that's not quite in the ruling, as the owner has mentioned, this court can review this record from a do-no-mo perspective and find that there is evidence in this record that those statements were all voluntarily given. And we do have that evidence in this record, even though it wasn't put forth in front of the trial court exactly as this court has been speaking. In this case we have that she was 39 years of age. She has an 11th grade education. So to respond to what counsel was saying, we can presume that she can read. We can presume that she can read and write since the evidence is that she has an 11th grade education. And she has prior contacts with the criminal justice system. In addition, we know there's no compulsion or inducement for the reasons previously stated because they never raised an issue of coercion. And if you look at her later videotaped statements to the detectives, the tone and tenor of these statements is conversational. It's pleasant. It's open and cooperative. At one point she tells the detectives that she thought of them as father figures, and she asked to hug them on two different occasions, specifically hugging them at the end of her statement. So we know that these were voluntarily made. Well, isn't part of establishing that they're voluntarily made showing that there were no inducements or promises of any kind? The record is devoid, I believe, of anything to that effect, and that's the prosecutor's burden to establish in order to shift the burden to the defense to establish involuntariness. Well, we certainly know in the videotaped statements there were no promises or inducements because all of that is videotaped. That would be a first. Then you make the papers. What's that? In the conversations on April 20th and 21st, the defense specifically stated that they weren't raising the issue of voluntariness, so it's presumed that there was no inducements or coercion or anything of that type because had there been anything to bring, first of all, they would have brought it in an entirely different motion. They never brought an entirely different motion. They chose only to bring the motion, and they even say it in their argument that they're raising the technical rights under the statute. It was a legal argument that they were making. They never claimed that there was anything involuntary about these statements, and our position would be that the trial court didn't, in fact, find that they were voluntary and didn't, in fact, find that they were reliable. This statute, though, does not trump Miranda law, does it? No, Your Honor, it does not trump Miranda law. However, in this case, they made no allegation of a Miranda violation. And yet again, they could have chosen to bring that issue in a pretrial motion, and if they really had truly felt that this was a custodial interrogation, they certainly would have. And once again, they did not bring that at trial, and there's no allegation of ineffective assistance of counsel for failing to bring that, which we would argue undermines their argument that this is a custodial interrogation at all. Let's move on, if we could, given your time, to the issue of her invocation of counsel, and also we'd like you to address the issue of the form that the defendant signed. Do you have a preference as to which first? Your ball. As to her invocation, the defendant did not unequivocally invoke her right to counsel in this case when she asked, is it possible if I can have a few days to get an attorney? Now, as counsel suggested, what the defense feels like the permissible responses were to that question. But in actuality, the detective answered the question. She asked, can I have a few days to get an attorney? And the detective stated, no, you can't have a few days. That was a proper answer to the defendant's question. It answered it in its entirety, and the detective did more. Once he left the room and came back, he actually clarified, which is exactly what the Supreme Court in Davis said. If he felt like it was an ambiguous request, that's what he should do. And when he clarified, he specifically stated to her, are you requesting, were you requesting an attorney? Because if you are, we're done talking. OK. And then there was some more conversation between the two of them. At the end, he says, do you or an audible want to answer questions? Yeah, I want to answer questions. OK, that's fine then. And to this regard, we appoint the court to the two cases that we cited in our brief, people versus Evans and people versus Coveto. And specifically, the situation in this case is similar, very similar to the colloquies that occurred in both of those cases. In Evans, which was before the Illinois Supreme Court, during the beginning of his court-reported statement, the defendant stated to the assistant state's attorney, we can take time for you to get in a PD, right? At which point, the assistant state's attorney responds, it will take a little while, I'll stop the questioning, and we will call for a public defender. And the defendant says, no, go ahead. The Illinois Supreme Court found that this was not an invocation, equivocal, ambiguous, or otherwise, but merely an inquiry into the availability of a public defender. This is a little bit different. I think that's a fair citation. This is a little bit different, though, in that it seems from watching the interview and seeing what she was saying, not all of which made it into the transcript, I'll admit, it seemed to me that she was looking into getting private counsel, and she had some phone numbers from private counsel. You know, they didn't go through, you know, the typical kind of conversation that you see that, you know, a lawyer can be appointed for you, we can get the public defender. That kind of language wasn't really present in this particular case. Right, but that was present in her earlier interview. So key to this is this was the second or third of several interviews. At the beginning of her videotaped interviews at that point, she was Mirandized fully. She understood and waived, knowingly and voluntarily waived all of her Miranda rights. This exchange between her and the detective happened maybe a couple hours later into the videotapes. So the second or third. Where were we in terms of, you know, her implicating herself or this O'Neill guy in this, you know, scenario? Where were we at this point in time where she's thinking maybe I should get a lawyer? What had the police, what did they have? What layer of her story were we at? She had already fully implicated herself in the armed robbery and murder, but at this point she was saying she was at the account that she had given when she first implicated herself. That's a pretty important change in the circumstances of the revelations. Would you agree? I'm not sure I understand Your Honor's question. What I mean is she's, in the beginning she wasn't giving any inculpatory information at all. Then later on it comes out in dribs and drabs that, you know, she may have been there as a lookout when O'Neill and some other woman were in there. But now when she's looking for a lawyer, there's information that maybe she was involved herself. The information was already clearly out there. Back in April 21st she had first made herself a lookout in this crime. And then she had been processed in the violation of probation. She was then brought out on April 30th and begun talking to. At the point that she had this exchange with the detective, she had given two accounts, full accounts, making herself a lookout while Kevin O'Neill and this unknown prostitute weren't actually robbing and murdering the victim in this case. So at the point that she had this exchange, she had already fully made herself accountable for the armed robbery and murder in this case. Which is why, as we make in our brief, even if there is, even if this court finds that there is some type of implication here, she was already fully accountable for the murder at the time. On the felony murder. On the felony murder, exactly. Now she changes her story at the end to make herself the principal. But at the time, and, you know. She was convicted of the felony murder, not the first degree. That's right. That's right. And at this point, she completely has made herself an accountable participant prior to, fully prior to this exchange she had with the detectives. So at the time that she's having this conversation with him, she's already admitted that she was engaged in a plan with Kevin O'Neill and this unknown woman to participate in this murder. And that her responsibility was to make sure nobody got into the room. And the second case that we cited in our brief, even more parallels this situation. That's People v. Covado, where it was a videotaped interview with a detective. And in that case, the defendant said to the detective, and can the attorneys come right now, right this minute? The detective responded that the attorney was not coming right then, but the defendant did not have to speak to them, but if he was going to ask for an attorney, they could not speak to him and the questioning would cease. And the defendant said, no, I'll answer what you ask me. And in that case, the court found that a reasonable police officer could have interpreted the defendant's statements as the questions about the availability of the attorney. And the exchange that the detective had with the defendant in Covado was very similar to what happened with Detective Forberg in this case. And the Covado court went on to say that the unavailability of an attorney at the beginning of the interview caused the defendant not to ask for one. And that's a situation that we have here. When he said to her, if you're asking for an attorney, we'll stop questioning you. She said, no, I want to answer questions. So we would argue that it is not an invocation of any type. But if it was at all, it was ambiguous. And when they clarified it, she did not invoke her right to an attorney. Now, touching back, I did want to touch back on what Your Honor referred to as the signed waiver that she had. If there's just one other thing that's sort of nagging me. If we were to find that that particular part of the statements should not have been considered because of the invocation of counsel and appreciated that you have all the other information that was given in these other statements that you referenced, didn't the court, when the court was making his finding and entering his judgment, didn't the court take greatly into account the statement that she gave where she was actually involved and she was hitting him with the iron and, you know, choking him and all of that? It seemed like that was inextricably interwoven in his judgment. Well, that was the information of the court.  And along with that also came the defendant's attempt to raise some sort of self-defense and second-degree murder argument. So the court necessitated, it was necessary for the court to look at all of the statements as they progressed. However, if the evidence was to stop at this point, there was more than enough evidence to convict her of the felony murder, and she actually wouldn't get the benefit of her second-degree arguments. I'm just trying to figure out, you know, remedy-wise. You know, if we were persuaded, and this is hypothetical, if we were persuaded that the last part of it, you know, when she says, my numbers are at county, that that part of it shouldn't have been admitted, you know, are you saying that we could affirm her conviction on felony murder even though the court clearly took into account everything that she said when she was whacking the guy with the iron? Yes, absolutely, Your Honor. Because the evidence that up until that point was more than sufficient for a reasonable trier of fact to find her guilty, which is why, as we argue in our brief, at the very most this is harmless beyond a reasonable doubt. Because the evidence here established that she was, just looking at the evidence up until this statement, say, for the sake of argument, the evidence established that she knew that they were going to rob him, that she agreed to be the lookout, that she was involved in this plan to get his money, that his money was obtained, and she was intrinsically involved in this crime. And she admitted to that. Those statements are voluntarily given and reliably made, and therefore this court can affirm if it so happens to find. Right. Okay. Turning back to the first issue, and on that, Miranda Waver. Take your time. I've interrupted you plenty. No, that's fine, Your Honor. The point that I didn't get to in my earlier argument is, outside of the voluntariness issue on the statute, our position is that the statute didn't even apply, and that's because there was no custodial interrogation here. At any time in those initial statements on the 20th and the 21st. And that's because there was no interrogation at all, because none of the defendant's statements, let me rephrase, the officer's questions were not reasonably likely to elicit an incriminating response at any time during those first statements. And that's because the defendant was not a suspect in these crimes during those first two-day spans. Even though they knew that she had given a false name, even though they knew that she had a violent history with the deceased? Well, we would dispute violent history with the deceased. What they knew is that there was one case report where her and another woman were named as offenders and the victim was named as a victim. When they questioned the other woman, the other woman denied that it even happened and said it was a misunderstanding. That woman was never in custody. The evidence shows that it doesn't even appear that she was brought down to the police station, that they spoke to her and she dismissed this incident outright, and there was only one incident. And when they talked to the defendant about this same case report, the defendant responded in kind and said it was a misunderstanding and that it never happened. So in addition, all of those people in that area, there were 10 people on the scene at the time that this murder occurred. All of those people were involved with the victim in some way or another. There was a number of people who had violent histories with him. There was a number of people that were known for coming to take his money, for robbing him. And in fact, six of the people on the scene at the time the victim's body was found said that this unknown African-American prostitute had been with him in the hours and days prior to his murder. And three of those people accounted for the defendant's whereabouts immediately before she found the body. So at the time they went to talk to the defendant, she wasn't even a suspect. And the reason that's significant is because they didn't treat her as a suspect. The questioning was in no way reasonably likely to elicit an incriminating response. Now, as to when she did voluntarily agree to go to the polygraph, she was given a form that had the Miranda warnings on there. She did sign those forms, and she did voluntarily consent to give that polygraph. Was it required that she be given the Miranda warnings at that time? No, Your Honor, because our position is that even that polygraph was not a custodial issue. Isn't that one of the indicia of being in custody and given Miranda? Well, on that form. Because you have it both ways, right? Well, it's a pre-printed form. Our position would be that just the fact that she was given her Miranda warnings does not change a non-interrogative setting into an interrogation by any means. It's better to determine whether she felt she was free to leave or not, though, isn't it? Possibly. And this is a unique situation because since she was being held on this violation of probation and warrant, she actually wasn't free to leave entirely. But as far as the murder was concerned, she was there as a witness and not as a suspect. And all of the questioning – Were they asking her any questions about what she was being held for? Were the officers asking her that? They have her in. They're holding her because she has a probation violation. Were they asking her any questions about that? No, absolutely not. There's no evidence that there was – Because they were interested in the murder. Exactly. And interested in what she knew about the murder. Not interested in even – they had no reason to believe that she was even complicit in the murder at this time. And even after the polygraph, which is significant, it still didn't show that she was a suspect. Let's get a wrap-up. Okay. And the last point on that is just that even after the polygraph, the only deception was on the question of what she saw. Did she see who killed Sweets? She never implicated herself even after the polygraph. So at that point, she still was not a suspect. May I briefly conclude? Thanks. Thank you. For those reasons and the reasons in our brief, the people of the State of Illinois respectfully request that this Court affirm the trial court's ruling admitting the defendant's pretrial statements and affirm her conviction. Thank you. Thank you. All right. Give us your best two minutes. Okay. I know. You're spending hours trying to rewrite it. Just a brief rebuttal. To the point that Ms. Harris was not subject to an interrogation, she clearly was a suspect in this murder. First of all, the Court noted that she was a suspect in one of its findings. Secondly, there were plenty of indications on the record that she was a suspect. She discovered the body. She lied about her name at the scene. She left for two weeks just to lie about her address. She was unable to be found for two weeks. There was not only that one case report. There were also witnesses who said that she was known for jumping Mr. Williams and that they were suspicious of her because she had become close to them. And then they have this other violent incident with Mr. Coffey that comes into play. And definitely, once she fails that polygraph exam, she's in custody. According to Officer Forbrook's testimony, there's indication of deception on the question, do you know who hit Sweets with an iron? And that question alone is enough to reasonably elicit an incriminating response from someone with Ms. Harris's position. Speaking to voluntariness, this was the State's burden. This was the State's burden to show that this was voluntary. This was the State's burden to show that it was reliable. But has the defendant ever conceded voluntariness as the State's argued? No. Instead, if you look at the context of defense counsel's statements, what defense counsel is saying is we're not raising an argument under the coercion statute, which is 114-11. What we're doing is we're raising this under this separate right, which is the right to a video or just an electronically recorded statement. Preserving, then, the right to argue voluntariness should the court find that this was a custodial setting requiring videotaping, and then if the State applied for an exception, then you would argue voluntariness? Is that it? Well, the State could argue any of the exceptions applied. So it wasn't defense counsel's burden to anticipate. Reserve that argument. Right. In the event the court finds it. Exactly. This was a strategy decision on defense counsel's part. They didn't have to. I mean, under the State's argument, they would have to allege 114-11 in violation of Miranda in order for them to be effective counsel and to show that this was a custodial interrogation. This is just a strategy decision. And here I would say that the court did find that this was a custodial interrogation, but just did not want to or did not construe the statute in the correct manner or just was not willing to give such an extreme remedy. It was a relatively new statute. It was a relatively new statute. It went into law in 2003 but wasn't effective until 2005. So this was, I don't know when the motions to suppress were argued, but the crime was committed in 2007 and the verdict happened in 2010. Statutory claim. Did the defense ever raise the issue of voluntariness separate from that hearing, from those proceedings? The defense did not separately raise the issue of voluntariness. But that was probably a strategy, and that's because they didn't have to give any notice to the state on what the state was going to rebut. The state had a higher burden under this statute. It was separate from that. No, not separate from that. The trial court decides this wasn't custodial, it didn't necessitate videotaping, you still have a right to bring a separate motion alleging that this was involuntarily obtained. And they didn't bring that motion. No, the defense counsel didn't bring that motion. I don't know, there's nothing on the record about why they didn't bring that motion. But I would say that looking at this statute, we can't presume on an empty record that this was a voluntary statement. This statute clearly makes it the state's burden to show that it's voluntary and reliable. Thank you, Your Honors. Thank you very much. Okay, thank you for the arguments and the briefs, and we will be back to you directly.